# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

**UNITED STATES OF AMERICA,**

      **Plaintiff,**

**v.**

**RAFAELA OCHOA,**

      **Defendant.**

**Case No. 16-40028-01-DDC**

## MEMORANDUM AND ORDER

This matter comes before the court on defendant Rafaela Ochoa's Motion to Suppress Evidence. Doc. 39. The government responded to defendant's motion (Doc. 41), and the court conducted an evidentiary hearing on the motion on November 15, 2016. After considering the evidence and the parties' submissions, the court denies defendant's motion. The court explains why, below.

**I.    Factual Background**

On September 30, 2015, around 10:00 a.m., Kansas Highway Patrol Trooper Christopher Nicholas saw from his patrol car a semi-trailer truck driving in the rightmost lane of eastbound Interstate 70 in Wabaunsee County, Kansas. Trooper Nicholas's patrol car is equipped with a dashboard camera ("dashcam"). It recorded many of the events relevant here shortly before and after Trooper Nicholas initiated the traffic stop. Trooper Nicholas also was equipped with a microphone that began recording his and others' voices just before he pulled over the truck, and it continued recording when he was out of the dashcam's line of sight. But where the video or audio is unclear or incomplete, the court relies on the credible facts that Trooper Nicholas provided in his testimony during the suppression hearing.

Trooper Nicholas observed that the Department of Transportation (DOT) number on one side of the truck, which he knew from his experience and training needed to be visible from fifty feet away, appeared to be too small.  Trooper Nicholas then saw the truck change without signaling from the right-hand lane of the highway to the left-hand lane and then to the exit ramp for a rest stop located on the left side of Interstate 70.  Trooper Nicholas decided not to stop the truck in the rest area because, in his experience, other drivers and pedestrians complicate traffic stops conducted in rest areas.  Instead, Trooper Nicholas waited and when the truck left the rest stop, he followed the truck as it merged onto Interstate 70.  He continued following the truck on the highway, and then stopped the truck on the side of the highway.

Trooper Nicholas got out of his patrol car and, for safety reasons, walked to the passenger-side door of the trailer.  He saw the driver, whom he identified during the suppression hearing as defendant Rafaela Ochoa, and a passenger, whom also he identified during the hearing as Erik Omar Rios.  Trooper Nicholas began his conversation with Ms. Ochoa and Mr. Rios by explaining that he had pulled them over for three reasons.  He referenced the insufficient size of the DOT number on the side of the truck, the fact that the truck's air brake lines were rubbing on the truck's catwalk between the truck and the trailer, and the lane transition Ms. Ochoa made without signaling when she had exited the highway to the rest stop.  Trooper Nicholas asked Ms. Ochoa and Mr. Rios for their driver licenses, proof of insurance, registration book, and logbooks that documented their on- and off-duty status.  Trooper Nicholas also asked what the truck was hauling, to which Ms. Ochoa responded, "Amazon," but she provided no further clarification about what the items were.[1]  Ms. Ochoa also said that the truck's destination was Indiana and

---

[1] During the suppression hearing, Trooper Nicholas testified that the company's bill of lading described the cargo as a load of bags or backpacks.  He also noted that the truck was refrigerated

that she was "barely starting" to drive for the company that owned the truck. Ms. Ochoa also explained that she previously had driven a truck locally in Los Angeles, California, for 14 years. Mr. Rios, the truck's co-driver, said he had driven for about two hours during the trip but that this trip was just his second one for the truck owner. Mr. Rios told Trooper Nicholas the truck's owner owned two or three trucks.

Trooper Nicholas then stepped away from the truck and told Ms. Ochoa and Mr. Rios they could follow him around the truck so he could point out the reasons he initially had pulled them over. He pointed out the air brake lines rubbing on the catwalk and the size of the DOT number on the driver's side of the truck. Trooper Nicholas asked Ms. Ochoa and Mr. Rios to show him the truck's fire extinguisher, and Trooper Nicholas inspected it. He then informed Ms. Ochoa that he did not intend to write her a ticket but that he planned to conduct a truck inspection and check paperwork. Trooper Nicholas told Ms. Ochoa to return to the driver's seat of the truck and Mr. Rios to return to the passenger's seat. Trooper Nicholas instructed Ms. Ochoa to turn on her front lights and then to watch for his signal to turn on her rear lights so he could check them. He also told Ms. Ochoa that eventually he would motion for her to get out of the truck and walk back to the patrol car. After giving Ms. Ochoa these instructions, Trooper Nicholas walked toward the back of the truck, checking the reefer's tank and noting that it was "almost empty," as well as checking the truck's rear tires. He signaled to Ms. Ochoa to turn on her left indicator, right indicator, and brake lights, and she did so. Trooper Nicholas waved with one hand to indicate he had finished inspecting the truck's rear lights. He then walked around the trailer to the side of the truck away from the highway to continue his inspection.

---

but was hauling a load that did not require refrigeration. The trooper testified a refrigerated trailer would use more gasoline than a non-refrigerated trailer would use.

3

Trooper Nicholas returned to his patrol car, sat inside alone, and closed the door. He read Ms. Ochoa and Mr. Rios' license numbers to the dispatcher and looked through the logbooks for Ms. Ochoa, Mr. Rios, and the truck owner. Trooper Nicholas noted the truck owner was off duty "a lot," during the last one-and-a-half to two months. He also noted that Ms. Ochoa had been off duty from September 25, 2015, to September 27, 2015, and that Mr. Rios had been off duty from July 21, 2015, to September 6, 2015, taken a trip to Wisconsin, returned to California, and was off duty again from September 14, 2015, to September 28, 2015. Trooper Nicholas commented on what he perceived to be long off-duty periods, saying the owner "couldn't be making any . . . money" and that Ms. Ochoa and Mr. Rios "aren't out here to make any money."[2] He also requested the dispatcher to run the license numbers and trailer tag through the system to check for stops and truck inspections.

Trooper Nicholas then got out of his patrol car, walked toward the truck, and motioned to Ms. Ochoa as planned to walk back to his patrol car. Once she did so, Trooper Nicholas told Ms. Ochoa he needed to check how the load was secured in the back of the trailer. He told Ms. Ochoa to open the trailer's rear doors. Trooper Nicholas then stepped up onto the truck's rear bumper and leaned into the trailer with a flashlight for about five seconds before stepping down. Trooper Nicholas then told Ms. Ochoa to close the back of the trailer. Ms. Ochoa began a conversation with Trooper Nicholas around this time before they walked toward his patrol car, asking for the location of the next truck stop so that she could take a shower. Trooper Nicholas responded that there was a truck stop a couple of miles away. He then walked toward and opened the passenger-side door of the patrol car, let Ms. Ochoa sit down, and closed the door behind her. Trooper Nicholas got into the patrol car's driver's seat and closed the door.

---

[2] Trooper Nicholas made these statements beginning at 16:30 on the dashcam video recording.

Ms. Ochoa continued conversing with Trooper Nicholas once inside the patrol car, telling him she liked the car. Trooper Nicholas asked about Ms. Ochoa's previous driving experience and, specifically, whether she had been required to keep a logbook before. Ms. Ochoa reiterated that she drove a trash truck locally in Los Angeles for 14 years and had kept a logbook for a "long time" but no longer had to keep one. She told Trooper Nicholas she had begun a vacation from her job in Los Angeles a few days earlier and was trying to decide whether she "like[d] it over here" in long-haul trucking. Ms. Ochoa said there was "a lot of traffic" in Los Angeles but that she was "used to it" and did not want to quit her job because of the benefits it offered her and her two children. But, she said she liked the fact that she could "just drive" on the highway. She also told Trooper Nicholas she thought the company that owned the truck was paying her 45 cents per mile, which Trooper Nicholas responded was "not bad."

Trooper Nicholas again explained the three violations and asked Ms. Ochoa if she had experienced a truck inspection before in California. Ms. Ochoa said she had. Trooper Nicholas also reiterated that the truck inspection would not affect her license, only the company's record. Trooper Nicholas also explained to Ms. Ochoa how truck inspections may affect the truck's owner; he used the example of an out-of-service violation such as a flat tire affecting the company's safety rating and, subsequently, that company's ability to secure loads for transit.[3]

Trooper Nicholas and Ms. Ochoa also made casual conversation. He asked Ms. Ochoa how long she had known Mr. Rios, and she responded that she had known Mr. Rios in school. He also asked Ms. Ochoa about a necklace she was wearing. Ms. Ochoa asked what Trooper Nicholas thought about "driving over here," by which she meant driving in the middle of the country as opposed to the west coast, and they discussed differing weather conditions, driving

---

[3] Trooper Nicholas testified during the suppression hearing that out-of-service violations could prevent a driver from operating a vehicle for up to 24 hours.

speeds, and traffic in the Midwest as compared to California. They also discussed regulations that apply to trucks driving in the snow.[4]

About 37 minutes after he began following the truck out of the rest stop, Trooper Nicholas gave Ms. Ochoa paperwork from the traffic stop and instructed her to sign a document.[5] He also told her to give a copy of the paperwork to the truck's owner to look over, sign, and send back within a designated time frame. Trooper Nicholas and Ms. Ochoa then had the following exchange:

    Ms. Ochoa: "That's going to be all?"

    Trooper Nicholas: "So just make sure he gets that."

    Ms. Ochoa: "I will."

    Trooper Nicholas: "And that's all I've got. You have a safe trip."

    Ms. Ochoa: "Thank you."[6]

At this point on the dashcam video, a door audibly opens, and one can hear highway traffic. Trooper Nicholas then asked Ms. Ochoa, "Hey, can I ask you a couple of things real quick? Is that okay?"[7] Ms. Ochoa can be heard saying "Yeah."[8] One can hear a car door

---

[4] During the suppression hearing, Trooper Nicholas testified that Ms. Ochoa seemed more nervous than normal and appeared to be overly talkative.

[5] Trooper Nicholas testified during the suppression hearing that the document summarized the inspection and violations.

[6] The exchange between Trooper Nicholas and Ms. Ochoa occurred at 37:18 on the dashcam video recording.

[7] Trooper Nicholas testified during the suppression hearing that he decided to ask Ms. Ochoa if he could question her further for several reasons. Trooper Nicholas testified that he was skeptical of Ms. Ochoa hauling a load that did not require refrigeration in a refrigerated trailer, the lack of income he commented about when reviewing Ms. Ochoa and Mr. Rios's logbooks, Ms. Ochoa's inability to explain what she was hauling beyond saying, "Amazon," and Ms. Ochoa's decision to leave a job in Los Angeles to try long-haul trucking.

closing, and the sound of highway traffic diminishes. Trooper Nicholas asked Ms. Ochoa for the truck owner's name and asked when the owner had approached Ms. Ochoa about driving the truck. Ms. Ochoa responded that the truck owner's name is Edgar Ortiz and that she had spoken with Mr. Ortiz about one month earlier. She said she had gotten her license to drive trucks 14 years earlier because she thought she might want to drive out of state. She told Trooper Nicholas she had put it off because of her children. But Ms. Ochoa said she did not want to say no to Mr. Ortiz because "he's really, like, a nice person" and because she is a single mother. She confirmed that Mr. Ortiz had a second truck that someone else was driving. Ms. Ochoa explained that she had left her seven-year-old son and 11-year-old daughter with a babysitter during the two- to three-week break she had from her job in Los Angeles to take one load to Indiana and another load back to California for Mr. Ortiz. Trooper Nicholas asked if Ms. Ochoa had to split the 45-cent-per-mile compensation with Mr. Rios; Ms. Ochoa responded that she did not. She explained several times that Mr. Rios was not driving much, wanted to learn, and potentially wanted to buy a truck. Trooper Nicholas asked to see Mr. Rios' temporary license and noted that it was expired.

 Trooper Nicholas then asked Ms. Ochoa if she had anything illegal in the truck. Ms. Ochoa said she did not. Trooper Nicholas then asked Ms. Ochoa if he could search the truck and the trailer "really quick," and Ms. Ochoa responded, "Yeah, you can check it."[9] Ms. Ochoa then got out of the patrol car. After Ms. Ochoa got out of the car, Trooper Nicholas talked with the dispatcher for about two minutes before getting out of the patrol car. The dispatcher told Trooper Nicholas about a border crossing Ms. Ochoa had made on July 5, 2015, from Mexico to

---

[8] This exchange occurred at 37:28 on the dashcam video recording.

[9] Trooper Nicholas' search occurs at 42:13–42:17 on the dashcam video recording.

San Diego, California, and a crossing Mr. Rios had made on September 25, 2015, also from Mexico to San Diego.

Trooper Nicholas then got out of the patrol car and walked with Ms. Ochoa back to the passenger side of the truck.  He asked Mr. Rios how many trips he had taken for Mr. Ortiz, referencing a truck inspection in December 2014 when Mr. Rios previously had driven for Mr. Ortiz.  Trooper Nicholas asked if Mr. Rios and Ms. Ochoa had anything illegal in the truck, including alcohol, drugs, firearms, and radar detectors.  They responded that they did not.  Trooper Nicholas also asked Mr. Rios if it was "okay to search," and one can hear Mr. Rios on the dashcam faintly answering, "Yeah."  Trooper Nicholas then asked Mr. Rios and Ms. Ochoa if they had any weapons on them and asked if he could search them.

During his search, Trooper Nicholas found cash, multiple cell phones, cigarettes, a box cutter, and alcohol in the truck.  He told Ms. Ochoa and Mr. Rios that having alcohol constituted an out-of-service violation.  After searching the truck, Trooper Nicholas asked Mr. Rios and Ms. Ochoa to open the trailer so he could search it.[10]  Trooper Nicholas found new bolts and a trace of spray foam, saying "Something ain't right there."[11]  He then walked back to the truck with Mr. Rios and Ms. Ochoa to search the truck again and found a flashlight and a gear puller.[12]  Trooper Nicholas informed Mr. Rios and Ms. Ochoa that he needed to search the truck and trailer further, and that he temporarily would keep the cell phones as well as their licenses.  But because of the alcohol out-of-service violation and Mr. Rios's expired license, neither Mr. Rios nor Ms. Ochoa

---

[10]  Trooper Nicholas asked Ms. Ochoa and Mr. Rios to open the trailer at 53:00 on the dashcam video recording.

[11]  Trooper Nicholas testified during the suppression hearing that he found a hidden modification while searching the truck's trailer that made him suspicious and prompted him to ask Ms. Ochoa and Mr. Rios to follow him into town.

[12]  Trooper Nicholas found a flashlight and gear puller at 58:50 on the dashcam video recording.

could continue driving the truck. Trooper Nicholas then told them to follow his patrol car off the shoulder of the highway and into town.

While the dashcam video footage ends with Trooper Nicholas guiding the truck to merge onto the highway, Trooper Nicholas testified during the suppression hearing that the truck was x-rayed and searched with a drug dog. In its response to defendant's Motion to Suppress, the government states the x-ray scan detected something hidden inside the trailer. Doc. 41 at 5. Once troopers searched the trailer, they found "a post-manufactured compartment containing approximately 20 kilos of cocaine." Doc. 41 at 5. Law enforcement authorities subsequently arrested Ms. Ochoa and Mr. Rios. Doc. 39 at 3.

## II. Analysis

The following three sections address the three challenges Ms. Ochoa makes in her Motion to Suppress. It addresses the arguments in the order in which Ms. Ochoa presents them. Doc. 39 at 6–9.

### A. The scope of the detention was reasonably related to the purpose of the traffic stop.

Ms. Ochoa argues that the scope and duration of Trooper Nicholas's questioning while Ms. Ochoa was still in his car after he had finished the truck inspection "exceeded the limits of the Constitution." Doc. 39 at 6. Ms. Ochoa cites Tenth Circuit precedent mandating that a driver be "'free to leave'" once a law enforcement officer has returned the driver's license and registration. *Id.* at 6. But, the Court holds that Ms. Ochoa's first detention met the Constitutional and Tenth Circuit requirements for such detentions.

Ms. Ochoa's initial detention complies with the requirement that law enforcement officials must tailor the scope of any compulsory detention carefully to its underlying justification. *United States v. Manjarrez*, 348 F.3d 881, 885 (10th Cir. 2003) ("An investigative

detention usually must last no longer than is necessary to effectuate the purpose of the stop, and the scope of the detention must be carefully tailored to its underlying justification.") (internal quotation marks omitted).  The Tenth Circuit has explained what this means.  "An officer conducting a routine traffic stop may request a driver's license and vehicle registration, run a computer check, and issue a citation."  *United States v. Hunnicutt*, 135 F.3d 1345, 1349 (10th Cir. 1998).  These are the steps Trooper Nicholas followed here, even though he exercised his discretion not to issue a citation to Ms. Ochoa.

Tenth Circuit precedent also allowed Trooper Nicholas to ask Ms. Ochoa about her travel plans during her detention.  "Under this Court's precedents, as part of a legitimate traffic stop a law enforcement officer is permitted to ask a motorist about [her] 'travel plans.'"  *United States v. Santos*, 403 F.3d 1120, 1131–32 n.6 (10th Cir. 2005) (citing *United States v. West*, 219 F.3d 1171, 1176 (10th Cir. 2000) ("[Q]uestions about travel plans are routine and may be asked as a matter of course without exceeding the scope of a traffic stop.") (internal quotation marks omitted)).  Trooper Nicholas's questions about Ms. Ochoa's plans for her trip were permissible as part of the traffic stop.  The court also finds that Trooper Nicholas and Ms. Ochoa's other conversations about her previous driving experience and comparisons between driving conditions in California and those elsewhere were consensual and permissible during the traffic stop.

### B. Trooper Nicholas's extension of the traffic stop was a voluntary encounter with Ms. Ochoa.

Ms. Ochoa next argues that Trooper Nicholas's second interaction with her was not a consensual encounter because his conduct "would not have communicated to a reasonable person that she was free to ignore Trooper Nicholas and get out of the police car."  Doc. 39 at 7.  Ms. Ochoa states that "there was no break" between the first and second encounters, that she had not

yet left the patrol car, and, without specific instruction, that Ms. Ochoa—whose primary language is not English—would not have felt free to leave the patrol car. *Id.* at 7–8.

Trooper Nicholas's second encounter with Ms. Ochoa was consensual because his words and actions sufficiently signaled that the first encounter had ended. *See, e.g.*, *United States v. Ledesma*, 447 F.3d 1307, 1315 (10th Cir. 2006) ("Phrases like 'thank you' and 'have a safe one' signal the end of an encounter, and afford a defendant an opportunity to depart ... Trooper Ranierri's words of farewell suggested that any subsequent discussion was consensual"); *United States v. Anderson*, 114 F.3d 1059, 1064 (10th Cir. 1997) (absent other indicia of coercion, detention became consensual once the officer handed the driver a citation and returned his paperwork even though the officer did not explicitly say the driver was free to go); *United States v. Elliott*, 107 F.3d 810, 814 (10th Cir. 1997) (same); *United States v. Werking*, 915 F.2d 1404, 1409 (10th Cir. 1990) (same).

Here, the dashcam video establishes that Trooper Nicholas told Ms. Ochoa to have a safe trip, signaling the end of their first encounter. The video then included audio of a car door opening. Trooper Nicholas subsequently asked Ms. Ochoa if he could ask her a few more questions, and that's when he asked if he could search the truck and trailer. She verbally agreed. No evidence suggests that Ms. Ochoa objected to Trooper Nicholas's further questioning or his request to search. Nor does the video indicate that Ms. Ochoa had problems communicating with Trooper Nicholas because of any language barrier. The exchanges recorded by the dashcam persuasively establish that defendant actually consented to Trooper Nicholas's additional questions and search.

### C. There is no poisonous tree.

Ms. Ochoa ties her two substantive arguments together in Part C of her Motion.  *See* Doc. 39 at 8–9.  There, she argues that her voluntary consent was "tainted because it was obtained after law enforcement had illegally detained" her.  Doc. 39 at 8–9.  But, the court has concluded that neither the detention nor the search involving Ms. Ochoa was illegal.  This conclusion means that no basis exists to exclude the evidence gathered against her.

**IT IS THEREFORE ORDERED THAT** defendant's Motion to Suppress (Doc. 39) is denied.

**IT IS SO ORDERED.**

Dated this 12th day of January, 2017, at Topeka, Kansas.

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**